CLERK'S OFFICE
A TRUE COPY
Jul 23, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Premises known as N56W24043 Daisy Court, Sussex, Wisconsin, more fully described in Attachment A.

Case No. 25-M-469 (SCD)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 8-6-25 *(not to exceed 14 days)*

X in the daytime 6:00 a.m. to 10:00 p.m. ❐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Stephen C. Dries, U.S. Magistrate Judge.
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❐ for ____ days *(not to exceed 30)* ❐ until, the facts justifying, the later specific date of ____________.

Date and time issued: 7-23-25. 10:15 am

*Judge's signature*

City and state: Milwaukee, WI

Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

______________________________
*Executing officer's signature*

______________________________
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is N56W24043 Daisy Court, Sussex, Wisconsin, further described as a two story, single family home with a two car garage. The house has grey siding.

The persons of DIAMOND BUCHANAN (DOB 1993) and THOMAS HOLMES (DOB 1984).

## ATTACHMENT B

*Property to be seized*

1. All records relating to violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1347 (Healthcare Fraud) and 18 U.S.C. § 1034 (False Statements Related to Healthcare) and involve Diamond BUCHANAN or Thomas HOLMES since January 2020 including:

   a. Any contacts, messages, or communications between BUCHANAN or HOLMES and any Holmes employee, resident, or other individual doing business with Holmes Adult Family Homes, Inc;

   b. Any records and information showing staffing levels, planning for staffing levels, or recruitment and hiring of employees to work at Holmes;

   c. Any records and information showing that BUCHANAN or HOLMES was providing resident care at any time during relevant period;

   d. Any records and information showing that BUCHANAN and/or HOLMES was not capable of providing resident care at any time during the relevant period;

   e. Any records and information about billing on behalf of Holmes;

   f. Any records and information about staffing levels at any Holmes facility;

   g. Any records and information showing BUCHANAN's discussion of required staffing levels at any Holmes facility, including information about how many employees should care for any given resident;

h. Any records and information about who was authorized to set staffing levels at Holmes and who was authorized to submit bills on behalf of Holmes; and

i. Any records and information about what staffing level is paid for by any third party for a particular resident's care.

2. For any storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "DEVICE"):

a. evidence of who used, owned, or controlled the DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the DEVICE of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the DEVICE;

h. evidence of the times the DEVICE was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the DEVICE;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the DEVICE;

k. records of or information about Internet Protocol addresses used by the DEVICE;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms “records” and “information” include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

As used above, the terms “records” and “information” includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disk drives or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term “computer” includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term “storage medium” includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of DIAMOND BUCHANAN or THOMAS HOLMES to the fingerprint scanner of electronic device(s) subject to search and seizure under this warrant; (2) hold the device(s) found in front of the face of DIAMOND BUCHANAN or THOMAS HOLMES and activate the facial or iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

CLERK'S OFFICE
A TRUE COPY
Jul 23, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Premises known as N56W24043 Daisy Court, Sussex, Wisconsin, more fully described in Attachment A.

Case No. 25-M-469 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1347 | Healthcare Fraud |
| 18 U.S.C. § 1035 | False Statements Related to Healthcare |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]

*Applicant's signature*

Jill Dring, Special Agent FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 7-23-25

[signature]

*Judge's signature*

City and state: Milwaukee, WI

Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Jill A. Dring, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as N56W24043 Daisy Court, Sussex, Wisconsin, hereinafter "PREMISES," and the person of and personal effects in the immediate control of DIAMOND BUCHANAN (DOB: 1993), and THOMAS HOLMES (DOB 1984), further described in Attachment A, for the things described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since March of 2013. As a Special Agent, I investigate civil and criminal matters related to health care fraud involving violations of the Health Care Fraud Statute, False Claims Act, Anti-Kickback Statute and Stark Law. Prior to investigating health care fraud matters, I investigated criminal and national security related computer intrusion matters involving botnets, distributed denial of service attacks, the distribution of SPAM, malicious software, the theft of identification information, and other computer-based fraud. I have received training in computer technology, computer-based fraud and health care fraud.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that DIAMOND BUCHANAN (DOB: 1993), owner of Holmes Adult Family Homes, has committed violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1347 (Healthcare Fraud) and 18 U.S.C. § 1035 (False Statements Related to Healthcare).

## PROBABLE CAUSE

5. As described more fully below, probable cause exists to believe that BUCHANAN has engaged in violations of federal law arising from her operation of Holmes. In particular, information known to the affiant suggests that she has submitted bills, and received payment, for hundreds of hours' worth of services not provided to residents.

### Adult Family Care & Holmes Adult Family Homes

6. In 2020, BUCHANAN began operating Holmes Adult Family Homes.

7. According to the Wisconsin Department of Health Services, Division of Quality Assurance Public Director of Adult Family Health Care Facilities (WI DHS), Holmes provided programs for advanced age, developmentally disabled, emotionally disturbed, mental illness, irreversible dementia, Alzheimer's, physically disabled, terminally ill, and individuals with traumatic brain injuries.

8. Holmes operated four locations in the Milwaukee area and provided care to several residents at each of these locations.

9. Holmes received payments for its services through residents' insurance, including government funded insurance such as Wisconsin Medicaid and Medicare. These medical insurance

providers pay managed care organizations, which, in turn, contract with companies for adult family home services. Each adult family home provider receiving government funding interfaces with a managed care organization to receive authorization to bill and to submit bills.

10. BUCHANAN, through her ownership of Holmes, has entered into contracts with multiple such Managed Care Organizations ("MCOs"). Beginning in or around 2020, BUCHANAN voluntarily enrolled Holmes with Community Care Inc. (CCI) and Inclusa, both of which are MCO's. In or around 2022, BUCHANAN voluntarily enrolled with MyChoice, another MCO.

11. All three of these MCOs would enroll residents with Holmes. Under the contracts between the MCOs and Holmes, Holmes would provide specified levels of care for these residents. Holmes would bill for those services and receive payment from the MCOs.

12. The contracts between Holmes and the MCOs specified, among other things, how many caregivers Holmes would provide to each resident and the payment Holmes would receive for providing those caregivers. For certain residents, the MCOs might authorize additional caregivers.

13. BUCHANAN, on behalf of Holmes, would submit bills to the MCOs representing that services, including caregivers, had been provided to residents placed in Holmes's care. Based on those bills, MCOs would authorize payment to Holmes.

14. The submission of these bills represented a claim that contracted-for services had been performed. In other words, when BUCHANAN, on Holmes's behalf, billed for the services

provided to a given resident, the MCO treated that claim as though Holmes had provided all of the care it contracted to provide. If the contract required a particular resident to receive two dedicated caregivers, for example, when Holmes submitted its claim for that service, the MCO provided payment for the work performed by those two caregivers.

**Holmes Staffing Levels**

15. To provide the care authorized by the MCOs, Holmes would hire care workers. Those individuals would work at Holmes locations, caring for residents.

16. During several interviews, current and former employees have relayed to law enforcement that BUCHANAN set the staffing level and schedule for each Holmes location. She would interview potential workers, hire them, and schedule them to work. BUCHANAN often communicated the schedule to employees through text messages.

17. Workers received their work schedules in varying ways. Some would generally work a set schedule; i.e., typically covering certain shifts on certain days at one of the Holmes locations. Other workers would have their hours and work location change from time to time, or would receive updates from BUCHANAN on where and when to work. When BUCHANAN communicated scheduling needs with employees, she frequently did so via text message.

18. To track worker hours and provide payments to them, BUCHANAN relied on multiple systems. First, she utilized software to track worker hours. This system, provided by Workwell Technologies, can be used to track hours worked by employees. For many Holmes workers, the system worked by using a fingerprint scanner to sign in or out of work. Sometimes,

this system malfunctioned, so workers would provide the hours they worked directly to BUCHANAN via text or other means.

19. Holmes then used the information stored in this hours system to prepare paychecks for care workers.

20. During interviews with numerous current and former Holmes employees, law enforcement has determined that Holmes paid regularly hourly rates to its employees via paychecks, issued either in paper format or through direct deposit. Regular hourly payments were not paid outside this system, although occasional bonuses or other one-off payments might be sent to employees via other systems.

21. Payroll payments, in turn, were managed using software provided by Paychex. This system tracked how many hours' pay each employee received for a two-week pay period, and generated the payment (via check or direct deposit) to compensate that employee for their work.

**The Overbilling Scheme**

22. It is possible to compare the billing information that BUCHANAN, on behalf of Holmes, submitted to MCOs to the payroll information described above.

23. In September 2023, Holmes had 11 residents. Collectively, Holmes's contracts required it to provide 8 caregivers 24 hours each day, 1 caregiver 8 hours per day (designated to a particular resident) and 1 caregiver 16 hours per day (designated to a particular resident). To provide this number of caregivers over these hours requires a total of approximately 220 hours of work per day and 6,602 hours of work for the month.

24. During that same month, BUCHANAN, on Holmes's behalf, submitted bills to the MCOs representing that nearly 94% of that work was completed. This represents approximately 6,194 hours of work total.

25. However, during that same month, the payroll system shows only approximately 2,587 hours of pay being paid to workers, which is approximately 39% of the required staffing hours. Put another way, BUCHANAN's bills to MCOs for September 2023 represent that Holmes completed around 3,607 hours of work that Holmes did not pay its employees to complete.

26. During 2023, BUCHANAN, on Holmes's behalf routinely submitted bills representing that 93 - 100% of the work was completed. During that same timeframe, the payroll system shows only approximately 35 – 71% of the work being paid to workers.

27. A credible financial source reported the business accounts for Holmes, which were opened for the operation of an adult family home, were being used in a manner not commensurate with normal business operations.

28. In 2023, there were several large cash deposits that were funded by WPS-Wisconsin. On the same day, or the following day, BUCHANAN withdrew large amounts of money.

29. Between 2020 and 2024 bank statements indicated that there were roughly $1,836,000 cash withdrawals and about $589,000 cash deposits. An assisted living home typically does not run as a cash business. There was also normal business activity noted in the bank statements such as Rent/Mortgage payments of about $36,000 and payroll of about $821,000. This

supports the irregularity of cash withdrawals when an assisted living home's main expenses are typically housing and payroll.

**<u>HOLMES's Involvement in Holmes Adult Family Homes</u>**

30. THOMAS HOLMES is married to BUCHANAN. He is a co-owner of the business.

31. During witness interviews, some Holmes employees stated that they found their job by responding to a Facebook post on HOLMES's account. While BUCHANAN conducted the interview and hiring of these individuals, HOLMES's initial contact was how they became aware of the job at Holmes.

**<u>Likelihood of Electronic Evidence Pertinent to this Case</u>**

32. As noted above, BUCHANAN uses her phone and multiple types of software to operate Holmes. She texts employees regarding work schedules and the hours they work. In addition, she uses web-based software to store and utilize important information about her business, such as submitting claims to MCOs, tracking employee work hours, and maintaining payroll and other business accounts.

33. For example, I know that bills are submitted to MCOs on behalf of Holmes. The MCOs maintain web-based platforms for the submission of bills by adult family homes. To access these accounts, users must register and set up an account, which they use to log in and submit claims. Due to the frequency of claims submissions, BUCHANAN would have had to log into these claims portals on a regular basis.

34. Workwell Technologies software, which Holmes used to track employee hours, is likewise web-based and capable of being accessed by users remotely. In this case, this software tracked the hours of multiple employees working at several locations over weeks at a time. This data is then viewable by individuals who log in to review it. To log in, a user would have to create an account to access the data and review it. The information Workwell Technologies provided to investigators bears repeated instances of a user "Diamond Holmes" entering or modifying data concerning the hours a Holmes employee worked. This is consistent with witness interviews, who indicated that if the system for clocking in or out of work did not operate, they would text BUCHANAN to ensure that they received pay for all of the hours they worked.

35. Paychex is another computer-based system used by Holmes. Holmes employees testified that they were paid for the hours they worked, and Holmes used Paychex to issue pay checks to its employees. Paychex lists BUCHANAN as its primary contact for Holmes.

36. In addition, BUCHANAN maintained an email address, holmesafh@yahoo.com, that she used for correspondence with the MCOs. I know from my training and experience that Yahoo's email systems are web-based, and can be accessed from any internet-capable device.

37. As noted above, BUCHANAN uses mobile telephones to communicate with her employees about Holmes. AT&T has confirmed that two phone numbers are associated with BUCHANAN: (262) 902-1553 and (262) 409-5249.

38. According to the same AT&T records, these phone numbers are associated with multiple Apple iPhone devices. From approximately June 2022 to August 2023, phone number

(262) 902-1553 was associated with an iPhone 13. From December 2022 to June 2025, phone number (262) 902-1553 was associated with an iPhone 14 Pro Max. From approximately June 2022 to August 2023, phone number (262) 409-5249 was associated with an iPhone 11. From August 2023 to June 2025, phone number (262) 409-5249 was associated with an iPhone 15 Pro Max. Based on my training and experience, I know that any of these devices could have been used to send and receive the text messages described above.

39. In addition, as noted above, HOLMES has used Facebook to identify possible employees for Holmes, and to conduct at least preliminary communications with those candidate employees. Based on my training and experience, I know that using Facebook requires an electronic device such as a mobile phone, tablet, or computer, and could have been accessed from any internet-capable device.

**BUCHANAN's and HOLMES's Connection to the PREMISES**

40. The PREMISES is a single-family home in a residential neighborhood in Sussex.

41. Law enforcement has determined that BUCHANAN and HOLMES reside at the PREMISES.

42. On July 8th, 14th and 15th physical surveillance was conducted in the vicinity of the PREMISES. Surveillance observed both BUCHANAN and HOLMES at the PREMISES on different occasions. This includes BUCHANAN leaving the PREMISES in the late morning/early afternoon of July 15th.

43. Location data was gathered for the phone number ending in 5249. The data

confirmed the observations made by surveillance, showing the phone in the area of the home.

44. Based on our investigation to date, I am not aware of any "home office" for Holmes. As noted above, Holmes operates or has operated multiple family homes, but I am not aware of any of them serving as a principal place of business where BUCHANAN conducts business related to the operation of the company, such as preparing timesheets, making schedules, or filing claims.

45. I am not aware of any computers or laptops stored at or used at any of the residential home locations.

46. Based on my knowledge and experience, I know that individuals often maintain cellular phones, computers, tablets, and other electronic devices at their home. Based on the above, there is probable cause to believe that the PREMISES will contain cellular phones and other electronic devices.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

47. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media[1], including storage on mobile devices, laptop computers, tablets, and other

---

[1] Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

electronic devices. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

48. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer data and files or remnants of such files can be stored for long periods of times at no cost, and can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

49. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files and information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.

For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular

thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

50. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled

environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

51. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## Unlocking Devices Using Biometric Features

52. The warrant I am applying for would permit law enforcement to obtain from DIAMOND BUCHANAN and THOMAS HOLMES the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial or iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature on some devices called "Touch ID," which allows a user to register multiple fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature on some devices called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID. Some manufactures also produce devices that may be unlocked through iris recognition, which operates in a similar manner.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the target cellphone(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the target cellphone(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, some Apple

devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of DIAMOND BUCHANAN and THOMAS HOLMES to the fingerprint scanner of the device; (2) hold the device in front of the face of DIAMOND BUCHANAN and THOMAS HOLMES and activate the facial or iris recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

53. Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

54. I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

# **ATTACHMENT A**

*Property to be searched*

The property to be searched is N56W24043 Daisy Court, Sussex, Wisconsin, further described as a two story, single family home with a two car garage. The house has grey siding.

The persons of DIAMOND BUCHANAN (DOB 1993) and THOMAS HOLMES (DOB 1984).

## ATTACHMENT B

*Property to be seized*

1. All records relating to violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1347 (Healthcare Fraud) and 18 U.S.C. § 1034 (False Statements Related to Healthcare) and involve Diamond BUCHANAN or Thomas HOLMES since January 2020 including:

a. Any contacts, messages, or communications between BUCHANAN or HOLMES and any Holmes employee, resident, or other individual doing business with Holmes Adult Family Homes, Inc;

b. Any records and information showing staffing levels, planning for staffing levels, or recruitment and hiring of employees to work at Holmes;

c. Any records and information showing that BUCHANAN or HOLMES was providing resident care at any time during relevant period;

d. Any records and information showing that BUCHANAN and/or HOLMES was not capable of providing resident care at any time during the relevant period;

e. Any records and information about billing on behalf of Holmes;

f. Any records and information about staffing levels at any Holmes facility;

g. Any records and information showing BUCHANAN's discussion of required staffing levels at any Holmes facility, including information about how many employees should care for any given resident;

h. Any records and information about who was authorized to set staffing levels at Holmes and who was authorized to submit bills on behalf of Holmes; and

i. Any records and information about what staffing level is paid for by any third party for a particular resident's care.

2. For any storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "DEVICE"):

a. evidence of who used, owned, or controlled the DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the DEVICE of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the DEVICE;

h. evidence of the times the DEVICE was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the DEVICE;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the DEVICE;

k. records of or information about Internet Protocol addresses used by the DEVICE;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disk drives or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of DIAMOND BUCHANAN or THOMAS HOLMES to the fingerprint scanner of electronic device(s) subject to search and seizure under this warrant; (2) hold the device(s) found in front of the face of DIAMOND BUCHANAN or THOMAS HOLMES and activate the facial or iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.